# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

IN RE SUBPOENA
*AD TESTIFICANDUM*
ISSUED TO REPRESENTATIVE
TED YOHO

                                    CASE NO. 1:16-CV-188-MW/GRJ

_____/

## ORDER ON MOTION TO QUASH[1]

Ted Yoho represents Florida's Third Congressional District in the United States House of Representatives ("House"). One of his constituents, Terry Trussell, has been charged with a number of crimes in state court and is set to go to trial in Dixie County next week. Trussell seeks to compel Yoho to appear in state court and testify on his behalf. A subpoena issued by Mr. Trussell's attorney commands Representative Yoho to appear in state court beginning June 6, 2016. ECF No. 3-3, at 2. Yoho filed a notice removing the subpoena to this Court under 28 U.S.C. §1442, the federal officer removal statute.

---

[1] This Court has endeavored to issue an order in this matter as quickly as possible, but has been overseeing a civil trial in Gainesville all week.

Yoho makes three arguments as to why the subpoena cannot be enforced against him. First, he claims that sovereign immunity bars the enforcement of the subpoena. Second, he argues that, generally speaking, "high-ranking government officials may not be required to provide testimony in litigation in which they are not a party, absent compelling or extraordinary circumstances." ECF No. 3-1, at 11. Third, he argues that the testimony sought is not "relevant and material," and that therefore he need not respond to the subpoena under the Rules of the House of Representatives. These arguments will be considered in turn, but first there's a need to ensure that this Court has subject-matter jurisdiction over this case.

## I.   PROPER REMOVAL AND JURISDICTION

The removal of the subpoena is based on 28 U.S.C. §1442(a),[2] which says in relevant part that

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
>    (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or

---

[2] Representative Yoho did not specify under which subsection he bases removal, though it seems either (a)(1) or (a)(4) could be implicated.

> individual capacity, for or relating to any act under
> color of such office or on account of any right, title or
> authority claimed under any Act of Congress for the
> apprehension or punishment of criminals or the collec-
> tion of the revenue.
> . . .
>    (4) Any officer of either House of Congress, for or
> relating to any act in the discharge of his official duty
> under an order of such House.

Section 1442 also provides that the terms "'civil action' and 'crimi-

nal prosecution' include any proceeding (whether or not ancillary

to another proceeding) to the extent that in such proceeding a ju-

dicial order, including a subpoena for testimony or documents, is

sought or issued." *Id.* §1442(d)(1).

For removal to be proper, there must be a "civil action" or a

"criminal proceeding." Here there is. Before the 2011 amendments

to §1442, removal at this stage might have been premature. *See*

*Stallworth v. Hollinger*, 489 F. Supp. 2d 1305, 1311–12 (S.D. Ala.

2007). Now, though, it seems clear that there is a removable pro-

ceeding within the meaning of §1442(d)(1). There also needs to be

a "colorable federal defense" asserted by the federal officer. *See,*

*e.g.*, *Batchelor v. Am. Optical Corp.*, —F. Supp. 3d—, 2016 WL

2637354, at *2–3 (S.D. Fla. May 9, 2016). For reasons discussed

later, Representative Yoho has asserted such a defense. Removal

was therefore proper, and this Court has subject-matter jurisdiction.

## II.   SOVEREIGN IMMUNITY

Representative Yoho first argues that sovereign immunity bars enforcement of the subpoena. The problem with this argument is that it reads "sovereign immunity" too broadly. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). It also shields federal officers from suit in many instances, because "the sovereign can act only through agents and, when the agents' actions are restrained, the sovereign itself may, through him, be restrained." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949). But sovereign immunity does not shield all federal officers from all suits—the relevant question is "whether, by obtaining relief against the officer, relief will not, in effect, be obtained against the sovereign." *Id.*

Forcing a federal officer to testify over the objections of his superior or in contravention of federal law is usually impermissible. *See, e.g.*, *Smith v. Cromer*, 159 F.3d 875, 879–80 (4th Cir. 1998). Whether this is properly thought of as a matter of sovereign immunity under any circumstances is questionable. *See generally*

Gregory S. Coleman, Note, Touhy *and the Housekeeping Privilege: Dead But Not Buried?*, 70 Tex. L. Rev. 685, 696–702 (1992) [hereinafter Coleman]. In the particular context of members of *Congress*, however, the better analytical framework is probably that of privilege, not sovereign immunity. *See Nixon v. Sirica*, 487 F.2d 700, 739–40 (D.C. Cir. 1973) (MacKinnon, J., concurring in part and dissenting in part) ("[T]he House or the Senate itself judges and controls the extent to which its members and documents should be produced in courts and before grand juries in response to subpoenas. Congress since 1787 has claimed that it has the absolute privilege to decide itself whether its members or employees should respond to subpoenas and to determine the extent of their response. As far as I have been able to discover, that practice has never been successfully challenged.").

Whatever the proper framework—privilege or sovereign immunity—it's clear that any objection on these grounds is premature. The House's own procedure for having its members respond to subpoenas suggests that sovereign immunity and privilege don't come into play at this stage, where a subpoena has been issued but no effort to enforce the subpoena (through, say, contempt proceedings) has been commenced. "The rules and precedents of the House

require that no Member . . . may, either voluntarily or in obedience to a subpena, testify regarding official functions, documents, or activities of the House *without the consent of the House being first obtained.*" 3 Lewis Deschler, *Deschler's Precedents of the United States House of Representatives* ch. 11, §14 (1994) (emphasis added) [hereinafter *Deschler's Precedents*]; *see also* Rules of the House of Representatives, 114th Cong., Rule VIII [hereinafter House Rule VIII]. That procedure—which will be discussed more thoroughly later on—would be wholly unnecessary if a member of the House could simply claim sovereign immunity as a defense upon the issuance of a subpoena.

Perhaps there is still a role for immunity—once a testimonial privilege is *properly* invoked by the House or Senate or one of its members, then a subsequent effort to get the member of Congress to testify over that privilege is in effect an effort to get the body to act in a certain way, implicating sovereign immunity. But that comes in *after* a proper determination of whether the privilege is properly invoked. *Cf. Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 778 (9th Cir. 1994) (The . . . court [in *Boron Oil Co. v. Downie*, 873 F.2d 67, 69 (4th Cir.1989)] held that the doc-

trine of sovereign immunity precludes the state court, and the federal court that gained limited jurisdiction on removal, from compelling Downie, an EPA investigator, to testify *contrary to his agency's instructions*.") (emphasis supplied). Allowing sovereign immunity to be claimed at the outset—before a determination of whether the House actually objects to its member testifying—subverts the mechanism set up by the House for determining whether its members should respond to subpoenas.

In short, Representative Yoho's invocation of sovereign immunity is premature. The determination of whether the testimony sought is material and relevant, etc. must necessarily precede the House's decision of whether to allow Yoho to testify under the House Rules (again, more on that later). If the House were to allow Representative Yoho to testify, it's possible that sovereign immunity would be an issue—though it's hard to see how such an allowance would not amount to a waiver of that immunity.[3]

## III.   "EXTRAORDINARY CIRCUMSTANCES"

Representative Yoho further argues that "as a matter of federal common law, high-ranking government officials may not be

---

[3] Put a different way, if the House were to allow Yoho to respond to the subpoena and testify, then enforcement of the subpoena wouldn't be "restraining the sovereign" at all, and thus wouldn't implicate sovereign immunity.

required to provide testimony in litigation in which they are not a party, absent compelling or extraordinary circumstances." ECF No. 3-1, at 11. This is the kind of abstract principle that can only be distilled from the case law when one ignores the factual contexts of cases. The Eleventh Circuit case cited by Yoho, *In re United States (Kessler)*, 985 F.2d 510 (11th Cir. 1993) (per curiam), involved a subpoena directed to the Commissioner of the Food and Drug Administration that sought testimony relating to selective prosecution. *Id.* at 511. The Eleventh Circuit granted a writ of mandamus and quashed the subpoena, noting along the way that "[b]ecause of the time constraints and multiple responsibilities of high officials, courts discourage parties from calling them as witnesses and require exigent circumstances to justify a request for their testimony." *Id.* at 513. One exigency might be the unavailability of other witnesses who could provide the same testimony—something that wasn't present in *Kessler*. *See id.* at 512 ("In order to protect officials from the constant distraction of testifying in lawsuits, courts have required that defendants show a special need or situation compelling such testimony. . . . This case does not present extraordinary circumstances or a special need for the Com-

missioner's testimony; on the contrary, the facts weigh against allowing the subpoena. The record discloses that testimony was available from alternate witnesses . . .").

*Kessler*, like many of the cases on which it relied, involved the head of an agency, a gigantic bureaucracy in need of continual oversight and management. There are multiple reasons to limit the availability of such persons to testify about matters of agency policy. First, such information can normally and easily be obtained elsewhere, as in *Kessler*. Second, the deprivation suffered by these persons' agencies and the government as a whole would be great if such persons had to respond to all subpoenas because (1) they oversee large, complex bureaucracies with many officials under them and (2) their agencies are involved in activities across the nation. If, for instance, every person unhappy with a NPDES permitting decision could compel testimony from the head of the EPA to inquire about NPDES permitting policy, the EPA's operations would be severely impaired.

These reasons do not apply with equal force to members of the House. Each individual member of the House oversees a staff, to be sure, but the size of that staff pales in comparison to that of an agency like the Food and Drug Administration or the EPA. The

member's activities, localized as they are to his district and Washington, D.C., are far less likely to subject him to subpoena than the head of a major administrative agency, who oversees activities that occur throughout the nation. Simply put, a "federal common-law" rule such as the one used for agency heads seems inappropriate for members of the House when one considers the policy rationales behind the rule.

Despite the many differences between agency heads and members of Congress, a number of courts have applied the "exceptional circumstances" rule to members of Congress, as Representative Yoho points out. *See* ECF No. 3-1, at 18–19. This Court is not persuaded by the reasoning of these cases, both for the reason already discussed—members of Congress are not like agency heads or other executive officials—but also because the House already has a procedure for determining whether its efficient functioning demands that a member not respond to a subpoena. Of course the procedure set up by the House is mostly about protecting privileged information, but there's also an interest in the effective functioning of the body that might make the House reluctant to let one of its members testify. Consider the following, taken from the summary of a report of a House committee tasked with determining

"whether the service of a subpena or any other process by a court or a grand jury purporting to command a Member of this House to appear and testify invades the rights and privileges of the House of Representatives[:] . . .

> It is recognized that this privilege of the House of Representatives referred to is a valuable privilege insuring the opportunity of its Members against outside interference with their attendance upon the discharge of their constitutional duties.
>
> At the same time it is appreciated that there is attached to that privilege the very high duty and responsibility on the part of the House of Representatives to see to it that the privilege is so controlled in its exercise that it not unnecessarily interferes with the discharge of the obligations and responsibilities of the Members of the House as citizens to give testimony before the inquisitorial agencies of government as to facts within their possession."

2 *Deschler's Precedents* ch. 7, §15.1 (quoting 87 Cong. Rec. 8933 (Nov. 17, 1941) (statement of Rep. Sumners). For a court to perform the same balancing under what amounts to a "federal common-law rule" would be an intrusion into the affairs of a co-equal branch.

In short, the "extraordinary circumstances" rule is premised on policy considerations not implicated here and would, if applied, amount to a judicial intrusion into a co-equal branch of the federal

government's affairs. For these reasons, Representative Yoho's argument on these grounds is unpersuasive.

## IV.  THE HOUSE RULES

### A. Legal Background

#### 1.  *The House Rules, "Rights and Privileges," and The Speech or Debate Clause*

Representative Yoho's remaining argument has to do with the Rules of the House of Representatives, or the "House Rules." As alluded to earlier, the House Rules provide a mechanism by which the House deals with subpoenas served on its members. "Upon receipt of a properly served judicial or administrative subpoena or judicial order," a member of the House is supposed to "notify the Speaker of its receipt in writing," after which point the Speaker notifies the House. House Rule VIII.2. "Once notification has been laid before the House, the Member . . . shall determine whether the issuance of the judicial or administrative subpoena or judicial order . . . is a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights of the House. Such Member . . . shall notify the Speaker before seeking judicial determination of these matters." House Rule VIII.3. Here there's a slight ambiguity: does the member *have* to

12

seek a judicial determination, or may he instead make the determination on his own? The House Rules are not clear on this point. The one court to consider the matter seems to have construed Rule VIII as allowing a member the choice of whether to seek a judicial determination. *See Shape of Things to Come, Inc. v. Kane Cty.*, 588 F. Supp. 1192, 1193 (N.D. Ill. 1984). At any rate, once a determination is made, the member notifies the Speaker of the determination, House Rule VIII.4, and the Speaker informs the House, "generally describ[ing] the records or information sought" to the House in the process, House Rule VIII.5.

> After the determination has been reported to the House,
>
> [e]xcept as specified in paragraph (b) [which is not really relevant here] *or otherwise ordered by the House*, upon notification to the House that a judicial or administrative subpoena or judicial order . . . is a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights of the House, the Member, Delegate, Resident Commissioner, officer, or employee of the House *shall comply* with the judicial or administrative subpoena or judicial order by supplying certified copies.

House Rule VIII.6 (emphasis added).

This is an entirely sensible procedure—one that ensures that, unless otherwise ordered by the House, a member must testify about "material and relevant" matters. True, the testimony

sought must be "consistent with the privileges and rights of the House," but this seems mostly circular—if the House has given the green light to a member to testify, then it seems by definition it has decided to waive its relevant privileges and rights.

To see why this is true—why the decision on the part of the House to allow a member to respond to a subpoena necessarily means that the House has waived its "privileges and rights" (subject, perhaps, to certain conditions)—it's necessary to delve a bit into the history of how the House has dealt with subpoenas directed to its members. Deschler describes one such incident as follows:

> On Nov. 17, 1941, the House authorized by resolution (H. Res. 340) Mr. Hamilton Fish, Jr., of New York, to appear and testify before a grand jury of the United States Court for the District of Columbia at such time as the House was not sitting[.] . . . The authorizing resolution was adopted pursuant to the report of a committee that *the service of a summons to a Member to appear and testify before a grand jury while the House is in session does invade the rights and privileges of the House of Representatives*, as based on article I, section 6 of the Constitution, providing immunities to Members against arrest and against being questioned for any speech or debate in either House, *but that the House could in each case waive its privileges, with or without conditions* . . .

2 *Deschler's Precedents* ch. 7, §15.1 (emphasis added). This case-by-case treatment of subpoenas was the norm until the late 1970s

14

and early 1980s, when a mechanism similar to the one described above was adopted. *See* Ethan L. Carroll, Note, *The Institutional Speech or Debate Protection: Nondisclosure as Separation of Powers*, 63 Duke L.J. 1153, 1187–89 (2014) [hereinafter Carroll].

Against the historical case-by-case backdrop, and considering the House's own interpretation of allowing a member to respond to a subpoena as a form of waiver, it's difficult to see how the House's decision to allow a member to testify is anything other than a waiver of its privileges and rights.[4] House Rule VIII does go on to state that "[n]othing in this rule shall be construed to deprive, condition, or waive the constitutional or legal privileges or rights applicable or available at any time to a Member . . . or of the House itself, or the right of such Member . . . or of the House itself, to assert such privileges or rights before a court in the United States," House Rule VIII.8, but this is the kind of boilerplate reservation of rights that must yield in the face of a contrary intent

---

[4] It would be an interesting case if a member of the House *wanted* to testify but was forbidden from doing so. Can the House prevent one its members from waiving his Speech or Debate Clause privilege? Does the privilege belong to the individual legislator or the body as a whole? These are unresolved questions that this Court need not resolve today given that Representative Yoho does not wish to testify. For more, though, see Carroll, *supra*, at 1180–89, and *United States v. Helstoski*, 442 U.S. 477, 492–94 (1979).

expressed elsewhere in House Rule VIII's text and certainly manifest in its history. *Cf. United States v. Anglin*, 215 F.3d 1064, 1068 (9th Cir. 2000). ("The government's failure to remove from a plea agreement boilerplate language that reserves a defendant's right to appeal her conviction does not necessarily vitiate other language in the plea agreement that clearly waives that right.").

This construction does raise a question. The House Rules seem to suggest that waiver will only occur if the information sought is "consistent with the privileges and rights of the House," but of course it's hard to see why there would even need to be a waiver in such cases. The way to make sense of this oddity is to recognize two things. First, the universe of subpoenas or judicial orders that trigger House Rule VIII—that is, those "judicial or administrative subpoena[s] or judicial order[s] directing appearance as a witness relating to the official functions of the House or for the production or disclosure of any document relating to the official functions of the House,"[5] House Rule VIII.1—is broader than the

---

[5] The parties dispute whether the testimony Trussell seeks to elicit from Representative Yoho "relat[es] to the official functions of the House." This Court thinks it does. The testimony relates to Yoho's communications with Trussell *as his Representative*. This is not a case of Yoho being subpoenaed to testify about a car crash he witnessed while mowing his lawn; rather, he is being called to testify about conversations he had with Trussell in which his status as a member of Congress clearly played an important role

universe of subpoenas or orders seeking privileged information. After all, the Speech or Debate Clause does not cover everything that legislators do, and there may be many things "related to" the official functions of the House that are not covered. *See generally Gravel v. United States*, 408 U.S. 606, 616–21 (1972).

The second thing to recognize is that House Rule VIII is best read as requiring a member (or a court) to determine *whether* a given subpoena implicates the Speech or Debate Clause (or some other "privilege and right" of the House), but then allowing the House as a body to nonetheless allow compliance with the subpoena—that is, to waive its privileges and rights. This reading is admittedly a stretch given the plain text of House Rule VIII, but (1) it is consistent with the historical practice of the House discussed above and (2) it frankly makes much more sense. Moreover, putting too much stock in the text of House Rule VIII is dangerous given that it's hardly a fine specimen of draftsmanship.[6] Note, for instance, that the first section mentions both subpoenas "directing appearance as a witness" and requiring "production or disclosure

---

[6] Which is somewhat distressing given that it is written by lawmakers to govern the internal affairs of lawmakers. But sometimes chefs at fine restaurants, returning home late after a night serving up haute cuisine, prefer a simple grilled cheese sandwich. The House Rules are the legislative equivalent of a grilled cheese sandwich, though perhaps less appetizing.

of any document" relating to the official functions of the House, but by the time we get to Rule VIII.6(a) only subpoenas seeking documents seem to be at issue. House Rule VIII.6(a) ("the Member . . . shall comply with the judicial or administrative subpoena or judicial order by supplying certified copies"). Note also the wonky grammar throughout: "the Member . . . shall determine whether the issuance of the judicial or administrative subpoena or judicial order . . . is a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights of the House." House Rule VIII.3. How can a subpoena itself—or its issuance—be "material and relevant?" What this clearly means is that the subpoena must call for the production of *documents or testimony* that is material or relevant. And yet what it means is not what it says.

No doubt "it is the 'duty of the judicial department to say what the law is.' . . . But it is equally true that the longstanding 'practice of the government' . . . can inform our determination of 'what the law is.'" *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560

(2014) (citations omitted).[7] Here, the "precedents of the House require that no Member . . . may, either voluntarily or in obedience to a subpena, testify regarding official functions, documents, or activities of the House without the consent of the House being first obtained." 3 *Deschler's Precedents* ch. 11, §14. House Rule VIII sets up a procedure for obtaining (or not obtaining) that consent, though it does so using somewhat imprecise language.

### 2.     The Role of the Courts

What role, then, do the courts play? Rule VIII seems to contemplate that a member *may* seek a judicial determination of whether the testimony sought is privileged, material and relevant, etc., but need not seek such a determination. Provided that a party seeking to enforce a subpoena would be able to challenge the member's (and the House's) determination in court, this seems consistent with the principle that a branch of the federal government cannot by itself determine the scope of one of its own privileges or immunities. *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 703–05 (1974). In other words, assuming the possibility of subsequent judicial review of the privilege determination, Rule VIII can be read

---

[7] "[I]t is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules." *United States v. Rostenkowski*, 59 F.3d 1291, 1304 (D.C. Cir. 1995).

as authorizing a member to either (1) seek a judicial determination
of whether a subpoena is material and relevant, etc. and then re-
port that determination to the House or (2) make the determina-
tion himself.

What this suggests is that when a member of the House
comes to court seeking to quash a subpoena *before* the House has
determined whether to allow him to respond to the subpoena, qua-
shal is premature. The proper course is for a court to make a "ju-
dicial determination," as contemplated by the House Rules, and
then send the matter back to the House to determine whether to
allow the member to testify.

One of the few cases that this Court has found dealing with
House Rule VIII supports this interpretation of the court's role at
this stage. In *Shape of Things to Come*, a party in a civil action
served a subpoena to produce documents on a nonparty member of
the House. 588 F. Supp. at 1193. The House member opposed pro-
duction, prompting the party seeking the documents to file a mo-
tion to compel. *Id.* The court refused to compel production, reason-
ing as follows:

> This motion raises questions of relevancy and privi-
> lege. Neither issue is properly before the court. Rep.
> Corcoran is empowered to decide whether the material

sought from him is relevant to this case and whether production is consistent with his rights and privileges as a member of the House. Until he informs the Speaker and properly seeks a ruling from this court, the court cannot, consistent with House Rule L, decide these questions. . . . Rep. Corcoran has expressly reserved the right to determine whether any of the material sought is privileged. . . . He invites the court to decide the relevancy issue but apparently has not informed the Speaker of his intention to do so. Neither question is, therefore, properly before the court.

Due deference to the Rules of the House of Representatives requires the court to deny STC's motion to compel production at this time. Rep. Corcoran must follow Rule L and either decide whether the documents sought are privileged and inform the House of his determination, or inform the Speaker of his intention to seek a judicial determination.

*Id.* at 1194.

This Court agrees with the court in *Shape of Things to Come* in its analysis of the proper procedure in a case such as this one, with one exception. A member of the House's failure to comply with the requirement that notice be given to the Speaker before seeking a judicial determination of relevance, privilege, etc. does not deprive a court of the ability to make such a determination. This Court cannot enforce the House's internal rules. Representative Yoho has not indicated whether he notified the Speaker of the subpoena; even if he hasn't, though, this Court can entertain a request for a judicial determination as to relevance, etc. Representative

Yoho's motion to quash can fairly be construed as such a request, and so this Court will make a determination.

This determination, in turn, may very well lead the House to not allow Representative Yoho to respond to the subpoena, a choice which would provide Yoho with a likely defense to any attempt to enforce the subpoena, at least in state court.[8] He therefore comes to this Court with a "colorable defense" to having to respond to the subpoena, giving this Court jurisdiction under §1442(a).

### 3.    *Relevance and Materiality*

One final question remains before turning to the facts of this case. What does "material and relevant" mean in the context of House Rule VIII? One federal court has construed this requirement to be coterminous with the scope of civil discovery, but that was in the context of subpoenas issued to members of the House in the course of a civil lawsuit in federal court. *See Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 41 n.1 (D.D.C. 2007). It seems clear that the meaning of "material and relevant" depends on the

---

[8] For a discussion of some of the odd differences between the role of sovereign immunity when subpoenas are issued to federal officials in actions in state versus federal courts, see Coleman, *supra*, at 699–700, and *Exxon Shipping Co.*, 34 F.3d at 778–80.

nature of the underlying action for which a House member's testimony is sought. Here, then, "materiality" and "relevance" would be given their meaning under Florida law in the context of a criminal defendant seeking testimony from a witness.

Happily, these very terms are often used in describing which types of witnesses may be compelled to testify under the Sixth Amendment and Florida law. *See Washington v. Texas*, 388 U.S. 14, 23 (1967) ("We hold that the petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been *relevant and material* to the defense.") (emphasis added); *Vann v. Florida*, 85 So. 2d 133, 136 (Fla. 1956) (a "subpoena should not be quashed or set aside, on the ground that the evidence called for by it is not *relevant or material*, in a close or doubtful case, but only where the futility of the process to uncover anything useful or legitimate is inevitable or obvious") (citation and quotation omitted) (emphasis added). And this, of course, makes sense—if a subpoena seeks irrelevant and immaterial information such that a court would quash the subpoena on

those grounds, there's no need for the House to assert a privilege. The member of the House can simply go to court and quash the subpoena on the grounds that the testimony sought "could shed no light on the issues of [the underlying] case." *See Kridos v. Vinskus*, 483 So. 2d 727, 731 (Fla. 4th DCA 1986) ("One who could shed no light on the issues of a case, civil or criminal, did not have to testify at deposition or trial, long before there was a constitutional privacy provision in Florida.").

### B. Analysis

#### 1.    *Trussell's Alleged Crimes*

Trussell is charged with committing three different kinds of crimes: impersonating a public officer, unlawful use of simulated legal process, and unlawful retaliation against a public officer. ECF No. 3-2, at 2.[9] The events giving rise to these charges occurred in August of 2014. *Id.* at 2–3.

The three crimes Trussell is charged with all fall under the heading of "[c]riminal actions under color of law or through use of simulated legal process." §843.0855, Fla. Stat. (2013). "A person who deliberately impersonates or falsely acts as a public officer or

---

[9] These are categories. The information charges 14 separate counts. ECF No. 3-2.

employee in connection with or relating to any legal process affecting persons and property, or otherwise takes any action under color of law against persons or property, commits a felony of the third degree . . . ." *Id.* §843.0855(2). "A person who simulates legal process, including, but not limited to, . . . indictments, subpoenas, warrants, injunctions, liens, orders, judgments, or any legal documents or proceedings, knowing or having reason to know the contents of any such documents or proceedings or the basis for any action to be fraudulent, commits a felony of the third degree . . . ." *Id.* §843.0855(3). "A person who falsely under color of law attempts in any way to influence, intimidate, harass, retaliate against, or hinder a public officer or employee involving the discharge of his or her official duties by means of, but not limited to, threats of or actual physical abuse or harassment, or through the use of simulated legal process, commits a felony of the third degree . . . ." *Id.* §843.0855(4).

### 2.   *Testimony Sought from Yoho*

Trussell claims that Yoho will testify to the following matters:

(1)   "[A] May 2014 conversation between Congressman Yoho, Mr. Trussell, and a Colonel Harry Riley (Ret.) that occurred

in Washington." ECF No. 9, at 8. At this meeting, Trussell claims that Representative Yoho "told me my best strategy to effect change in federal government would be to return home, and work to 'fix' my local government. The People would then have more leverage to affect our state; thereby giving us more force to impact the corruption (my term) in D.C." ECF No. 3-5, at 2.

(2)    "[A] meeting . . . around 7 P.M., October, 14 2014, between Rodger Dowdell, Marie Trussell, Canetha Dodd, and Rodger Dowdell, an administrator for Florida's Common Law Grand Jury movement. They met with Yoho and presented him with the circumstances of Trussell's arrest for failure to appear in court, while standing in court, five minutes before court was noticed to begin. . . . Ted Yoho at that meeting, emphatically committed to Mr. Dowdell, that he would help Trussell." ECF No. 9, at 20.

(3)    "A third meeting [that] took place with Yoho at the Brass Monkey, Gainesville, FL, on or about May 23, 2015, [during which] Trussell's wife, Marie, and Trussell met with Ted Yoho to bring him up to date on the progress of the defense against State's prosecution. During the discussion, many details of how the defense were developing and how discovery was revealing State had not conducted any substantive investigation of the case, or had any

26

understanding of the circumstances surrounding the charges were discussed, since the grand jury information was hidden. Yoho was very attentive and understood the points made. Again, Yoho expressed his sympathy to the Trussell family plight and offered to consider anything he could do to help." *Id.* at 20–21.

(4)    Communications between Yoho and the "alleged victim" of Trussell's crimes, Jeffrey Siegmeister, including one instance in which "Yoho was 'warned off' helping Trussell by . . . Siegmeister." *Id.* at 21–22.

(5)    An October 2014 e-mail from Yoho to a Roy Callahan (now deceased) in which Yoho stated that he would "work to get Terry out." ECF No. 9-2, at 4.

### 3.    *Relevance and Materiality*

Trussell claims that the testimony sought from Yoho "goes to the heart of the intent, credibility, injury, impeachment of victim, the numerous defenses, including good-faith and immunity, and the first amendment rights to assemble and express opinions, as well as potential improper arrest and incarceration of Trussell." ECF No. 9, at 8. Trussell makes a number of other arguments about why the testimony sought from Yoho is material and relevant. *See* ECF No. 9, at 19–29. None is worth addressing in any

detail. It's clear that Yoho has nothing to say that would have any relevance to the charges against Trussell. For one thing, with the exception of the May 2014 meeting in Washington, D.C., all of the communications involving Representative Yoho occurred *after* the alleged crimes—indeed, many of them occurred after Trussell was arrested. It appears that what Trussell wants to have Yoho testify about is the perceived unfairness of the manner of Trussell's arrest and prosecution, not the underlying criminal charges.

The one conversation involving Yoho that predates the alleged criminal activity has no relevance to any element of the charged offenses or any legally cognizable defense. Presumably Trussell will try to argue that he cannot be convicted because he lacked the requisite fraudulent intent or knowledge of falsity—that is, he actually thought he possessed the legal authority to take the actions he took. But all Yoho told him in May 2014 was that he should go home and try to "'fix' [his] local government." How could Yoho's testimony to that effect plausibly be relevant to the question of Trussell's mental state? Trussell states that he "firmly believe[s] Ted's verification of the . . . conversation would show a jury, I had the most honorable intentions by fighting corruption, in defense of the people in my county." ECF No. 3-5, at 2. "Honorable

intentions" is not a defense to the charges against Trussell. One can act in a subjectively "honorable" way and also act with the requisite fraudulent intent or knowledge of falsity to violate the simulated legal process statute. Such intentions might be relevant at sentencing, but they are not legally relevant to the question of whether Trussell committed the charged crimes or has a cognizable defense.

Frankly, the theories of relevance advanced by Trussell only make sense if one adopts Trussell's philosophy of government. The State's actions in connection with his arrest and prosecution are illegitimate, according to Trussell, and this amounts to a defense. Yoho can corroborate that Trussell actually holds these beliefs, and that Trussell seeks only to "defen[d] . . . the people in [his] county." But none of these are defenses. Trussell is going to be tried in a court of the State of Florida, not a court of the government of his imaginings. Yoho's testimony might be relevant and material given the law as Tressell believes it to be, but his testimony is immaterial and irrelevant given the law as it actually is.

What is happening here is clear: though Yoho could not offer any testimony that would be *legally* relevant and material, his mere presence at the trial might very well help Trussell. A jury

29

informed of Trussell and Yoho's relationship might be more willing to credit any claim by Trussell that he legitimately believed he had the legal authority to take the actions he was taking—after all, how crazy could someone's beliefs be if that person is so chummy with a sitting member of Congress? And Yoho is apparently very popular in Dixie County—he won his seat with nearly 75% of the vote in 2014.[10] Trussell is seeking to curry favor with the jury by calling as a witness the community's quite popular sitting Representative. But Representative Yoho has nothing relevant to say, and certainly nothing "material and relevant" to say.

Given this finding, it's unnecessary to determine whether the testimony sought is privileged. Even if he weren't a member of Congress, Representative Yoho could avoid the subpoena because it seeks irrelevant testimony. *See Kridos*, 483 So. 2d at 731.

## V.   CONCLUSION

A defense based on sovereign immunity or privilege is premature since the House of Representatives is in the middle—not at the end—of its decisionmaking process as to whether to allow Rep-

---

[10] *Unofficial Results, 2014 General Election*, Dixie County Supervisor of Elections, http://enr.electionsfl.org/DIX/Summary/1215/.

resentative Yoho to respond to the subpoena. The "exceptional circumstances" doctrine is not applicable under these particular circumstances. Insofar as Representative Yoho seeks to quash the subpoena, that request is premature; however, construed as a request for a judicial determination of the relevance and materiality of the testimony sought by the subpoena, the motion is proper. This Court finds that the subpoena seeks testimony that is neither material nor relevant.

What happens now is up to the parties, the House and the state court. Representative Yoho can move to quash the subpoena in state court. The trial judge may very well grant the motion, either because he feels bound by collateral estoppel to do so or because an independent review of the evidence convinces him that the testimony sought is irrelevant. The House may not consent to Yoho testifying, in which case an effort to enforce the subpoena would likely run up against the wall of sovereign immunity. In any event, this Court doubts that Representative Yoho will have to testify at Trussell's trial.

**IT IS ORDERED:**

1. The motion to quash, ECF No. 3, is **GRANTED IN PART and DENIED IN PART**. This Court does *not* quash the

subpoena issued to Representative Yoho. However, this Court finds that the subpoena seeks testimony that is neither relevant nor material to the state-court proceedings.

2. This case is **DISMISSED with prejudice**.

3. The Clerk shall close the file.

**SO ORDERED on June 3, 2016.**

<u>**s/Mark E. Walker**</u>
**United States District Judge**